1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10   GARY LASHER,

11          Plaintiff,              No. 2: 11-cv-2564 WBS KJN P

12      vs.

13   R. MIRANDA, et al.,

14          Defendants.         FINDINGS & RECOMMENDATIONS

15   _____/

16   I.  Introduction

17          Plaintiff is a state prisoner, proceeding without counsel, with a civil rights action

18   pursuant to 42 U.S.C. § 1983.  Plaintiff alleges that he received inadequate medical care for a

19   shoulder injury in violation of his Eighth Amendment right to adequate medical care.  Named as

20   defendants are Physician's Assistant Miranda, Dr. Pomazal, Dr. Nepomuceno and Dr. Swingle.

21          Pending before the court is defendants' summary judgment motion.  Defendants

22   move for summary judgment on grounds that they are entitled to qualified immunity.  After

23   carefully reviewing the record, the undersigned recommends that defendants' motion be granted

24   in part and denied in part.

25          At the outset, the undersigned notes that in their reply, defendants request that the

26   court reject plaintiff's opposition for failing to list which, if any, of defendants' undisputed facts

1

1  he disputes.  Defendants argue that plaintiff's failure to address their statement of undisputed

2  facts violates the Local Rules.  In his opposition, plaintiff observes that the declaration of

3  defendants' expert states that he reviewed plaintiff's medical records beginning in May 2010,

4  although plaintiff's claims involve events beginning in 2008.  As will be discussed herein, it is

5  clear that defendants' expert reviewed plaintiff's 2008 records, as he references them in his

6  declaration.  Also, as will be discussed herein, it is not clear whether defendants' expert reviewed

7  all of plaintiff's relevant medical records in forming his opinion, although he represents that he

8  did so.

9         Both parties have submitted problematical pleadings.  Rather than striking

10  plaintiff's opposition and the declaration of defendants' expert, the undersigned has considered

11  both, noting their deficiencies herein.

12  II.  Legal Standard for Summary Judgment

13         Summary judgment is appropriate when it is demonstrated that the standard set

14  forth in Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if

15  the movant shows that there is no genuine dispute as to any material fact and the movant is

16  entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).[1]

> Under summary judgment practice, the moving party always bears
> the initial responsibility of informing the district court of the basis
> for its motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any," which it believes demonstrate
> the absence of a genuine issue of material fact.

21  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

22  56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving party need

23  only prove that there is an absence of evidence to support the non-moving party's case."  Nursing

---

25  [1]  Federal Rule of Civil Procedure 56 was revised and rearranged effective December 10,
26  2010.  However, as stated in the Advisory Committee Notes to the 2010 Amendments to Rule
56, "[t]he standard for granting summary judgment remains unchanged."

1  Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376,

2  387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 Advisory

3  Committee Notes to 2010 Amendments (recognizing that "a party who does not have the trial

4  burden of production may rely on a showing that a party who does have the trial burden cannot

5  produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment

6  should be entered, after adequate time for discovery and upon motion, against a party who fails to

7  make a showing sufficient to establish the existence of an element essential to that party's case,

8  and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.

9  "[A] complete failure of proof concerning an essential element of the nonmoving party's case

10  necessarily renders all other facts immaterial."  Id. at 323.

11          Consequently, if the moving party meets its initial responsibility, the burden then

12  shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.

13  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting

14  to establish the existence of such a factual dispute, the opposing party may not rely upon the

15  allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

16  form of affidavits, and/or admissible discovery material in support of its contention that such a

17  dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

18  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

19  of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

20  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

21  1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

22  return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

23  1436 (9th Cir. 1987).

24          In the endeavor to establish the existence of a factual dispute, the opposing party

25  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

26  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

1  versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary

2  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

3  genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

4  committee's note on 1963 amendments).

5         In resolving a summary judgment motion, the court examines the pleadings,

6  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

7  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

8  477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

9  court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

10  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

11  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

12  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

13  1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

14  show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken

15  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

16  'genuine issue for trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

17  III.  Legal Standards for Qualified Immunity and the Eighth Amendment

18                    *Legal Standard for Qualified Immunity*

19         Government officials enjoy qualified immunity from civil damages unless their

20  conduct violates "clearly established statutory or constitutional rights of which a reasonable

21  person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In ruling upon the

22  issue of qualified immunity, one inquiry is whether, taken in the light most favorable to the party

23  asserting the injury, the facts alleged show the defendant's conduct violated a constitutional right.

24  Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled in part by Pearson v. Callahan, 555 U.S.

25  223, 236 (2009) ("The judges of the district courts and the courts of appeals should be permitted

26  to exercise their sound discretion in deciding which of the two prongs of the qualified immunity

1   analysis should be addressed first in light of the circumstances in the particular case at hand").

2          The other inquiry is whether the right was clearly established.  Saucier, 533 U.S.

3   at 201.  The inquiry "must be undertaken in light of the specific context of the case, not as a

4   broad general proposition...."  Id.  "[T]he right the official is alleged to have violated must have

5   been 'clearly established' in a more particularized, and hence more relevant, sense:  The contours

6   of the right must be sufficiently clear that a reasonable official would understand that what he is

7   doing violates that right."  Id. at 202 (citation omitted).  In resolving these issues, the court must

8   view the evidence in the light most favorable to plaintiff and resolve all material factual disputes

9   in favor of plaintiff.  Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).  Qualified

10   immunity protects "all but the plainly incompetent or those who knowingly violate the law."

11   Malley v. Briggs, 475 U.S. 335, 341 (1986).

12          *Legal Standard for Eighth Amendment Claims*

13          Generally, deliberate indifference to a serious medical need presents a cognizable

14   claim for a violation of the Eighth Amendment's prohibition against cruel and unusual

15   punishment.  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  According to Farmer v. Brennan, 511

16   U.S. 825, 847 (1994), "deliberate indifference" to a serious medical need exists "if [the prison

17   official] knows that [the] inmate [ ] face[s] a substantial risk of serious harm and disregards that

18   risk by failing to take reasonable measures to abate it."  The deliberate indifference standard "is

19   less stringent in cases involving a prisoner's medical needs than in other cases involving harm to

20   incarcerated individuals because 'the State's responsibility to provide inmates with medical care

21   ordinarily does not conflict with competing administrative concerns.'"  McGuckin v. Smith, 974

22   F.2d 1050, 1060 (9th Cir. 1992) (quoting Hudson v. McMillian, 503 U.S. 1, 6 (1992)), overruled

23   on other grounds by WMX Technologies, Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997).

24   Specifically, a determination of "deliberate indifference" involves two elements: (1) the

25   seriousness of the prisoner's medical needs; and (2) the nature of the defendant's responses to

26   those needs.  McGuckin, 974 F.2d at 1059.

1          First, a "serious" medical need exists if the failure to treat a prisoner's condition

2   could result in further significant injury or the "unnecessary and wanton infliction of pain." Id.

3   (citing Estelle, 429 U.S. at 104).  Examples of instances where a prisoner has a "serious" need for

4   medical attention include the existence of an injury that a reasonable doctor or patient would find

5   important and worthy of comment or treatment; the presence of a medical condition that

6   significantly affects an individual's daily activities; or the existence of chronic and substantial

7   pain. McGuckin, 974 F.2d at 1059–60 (citing Wood v. Housewright, 900 F.2d 1332, 1337–41

8   (9th Cir. 1990)).

9          Second, the nature of a defendant's responses must be such that the defendant

10  purposefully ignores or fails to respond to a prisoner's pain or possible medical need in order for

11  "deliberate indifference" to be established.  McGuckin, 974 F.2d at 1060.  Deliberate

12  indifference may occur when prison officials deny, delay, or intentionally interfere with medical

13  treatment, or may be shown by the way in which prison physicians provide medical care."

14  Hutchinson v. United States, 838 F.2d 390, 392 (9th Cir. 1988).  In order for deliberate

15  indifference to be established, there must first be a purposeful act or failure to act on the part of

16  the defendant and resulting harm.  See McGuckin, 974 F.2d at 1060.  "A defendant must

17  purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for

18  deliberate indifference to be established." Id.  Second, there must be a resulting harm from the

19  defendant's activities. Id.  The needless suffering of pain may be sufficient to demonstrate

20  further harm. Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002).

21          Mere differences of opinion concerning the appropriate treatment cannot be the

22  basis of an Eighth Amendment violation. Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996);

23  Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).  However, a physician need not fail to

24  treat an inmate altogether in order to violate that inmate's Eighth Amendment rights. Ortiz v.

25  City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989).  A failure to competently treat a serious

26  medical condition, even if some treatment is prescribed, may constitute deliberate indifference in

1  a particular case.  Id.

2          In order to defeat defendants' motion for summary judgment, plaintiff must

3  "produce at least some significant probative evidence tending to [show]," T.W. Elec. Serv., 809

4  F.2d at 630, that defendants' actions, or failures to act, were "in conscious disregard of an

5  excessive risk to plaintiff's health," Jackson v. McIntosh, 90 F.3d at 332 (citing Farmer, 511 U.S.

6  at 837).

7  IV.  Plaintiff's Allegations

8          This action is proceeding on the amended complaint filed October 31, 2011.

9  (ECF No. 12)   Plaintiff alleges that as early as May 2008, he was seen by medical staff at High

10  Desert State Prison ("HDSP") for shoulder pain.  Plaintiff alleges that defendants denied and

11  delayed arthroscopic repair of his shoulder.  Plaintiff also alleges that defendants denied the pain

12  medication prescribed by specialists and physical therapists.  Plaintiff alleges that he was in

13  constant, never-ending pain, suffered sleepless nights as well as physical stress and depression as

14  a result of defendants' failure to treat his shoulder.  Plaintiff alleges that the delay in his receipt

15  of surgery caused further damage to his shoulder.

16  V.  Undisputed Facts

17          At all relevant times, plaintiff was housed at HDSP.  At all relevant times,

18  defendant Miranda was employed as a Physician's Assistant at HDSP.  At all relevant times,

19  defendants Swingle, Nepomuceno and Pomazal were employed as medical doctors at HDSP.

20          Plaintiff first injured his left shoulder while "kite surfing" in Mexico in 2004.

21  Plaintiff transferred to HDSP in January 2008.  In May 2008, plaintiff hurt his left shoulder while

22  exercising.  Plaintiff had shoulder surgery in September 2011.

23  VI.  Additional Factual Background

24          Defendants' summary judgment motion contains a statement of undisputed facts.

25  Plaintiff's opposition contains a "timeline" of events, which references exhibits attached to his

26  opposition.  Both parties have submitted numerous medical records from plaintiff's medical file.

1   Neither parties pleadings presents a complete view of plaintiff's relevant medical care prior to his

2   shoulder surgery in September 2011.  For that reason, the undersigned finds that analysis of

3   defendants' pending motion is best served by a summary of the medical records attached to the

4   pleadings of both parties.

5          On May 30, 2008, plaintiff filed a request for health care services form requesting

6   treatment for pain in his shoulder and knee.  (ECF. No. 54 at 57.)  The triage nurse wrote that

7   plaintiff reported that it felt like his left arm had been pulled apart with pain radiating from his

8   shoulder up into his neck and back.  (Id.)  Plaintiff was referred to a doctor.  (Id.)

9          On June 9, 2008, plaintiff submitted another request for health care form.  (Id. at

10  60.)  In this form, plaintiff wrote that he had shoulder pain, had not yet seen a doctor, he could

11  not eat or sleep as a result of the pain, and that the Naprosen was not working.  (Id.)

12         Later on June 9, 2008, a doctor saw plaintiff for his left shoulder pain.  (Id. at 61.)

13  The doctor ordered an MRI of the left shoulder.  (Id.)  The doctor also ordered Tylenol,

14  ibuprofen, an arm sling and made a referral for plaintiff to go to orthopedics.  (Id. at 63.)  On

15  June 10, 2008, the doctor also ordered an x-ray of plaintiff's left shoulder.  (Id. at 69.)

16         On June 12, 2008, plaintiff filed a request for health care services form stating that

17  he had not received the Tylenol or sling ordered by the doctor on June 9, 2008.  (Id. at 70.)  The

18  form is marked "resolved" on June 12, 2008.  (Id.)

19         On June 16, 2008, plaintiff filed another request for health care services form.

20  (Id. at 71.)  Plaintiff complained that the Tylenol was not working and that the pain was worse.

21  (Id.)  The response, dated June 24, 2008, stated that plaintiff had received the sling one week ago,

22  the MRI was scheduled, the x-ray of plaintiff's left shoulder was performed on June 24, 2008,

23  and that plaintiff reported his pain as 7-8 out of 10.  (Id.)  The response stated that plaintiff had a

24  doctor's appointment scheduled for June 25, 2008.  (Id.)

25         The notes from plaintiff's medical records indicate that plaintiff saw the doctor on

26  June 26, 2008.  (Id. at 73.)  The notes state that plaintiff injured his shoulder doing push-ups,

1   which exacerbated a previous injury from three years earlier.  (Id.)  The notes state that plaintiff

2   was to continue with Motrin and that he would also be placed on Robaxin.  (Id. at 74.)

3            On September 3, 2008, an MRI of plaintiff's left shoulder was performed at MD

4   Imaging in Redding, California.  (ECF No. 51-2 at 22.)  It is unclear whether this MRI was

5   performed with or without contrast.  (Id.)  The results of the MRI were mild tendinosis of the

6   distal rotator cuff without evidence of full-thickness discontinuity or retraction of the

7   myetendinous junction; no further abnormalities were identified.  (Id.)

8            On September 10, 2008, plaintiff saw orthopedist Dr. Parlasca.  (ECF No. 54 at

9   82.)  In his report, Dr. Parlasca wrote that plaintiff reported shoulder pain, popping, numbness

10  and tingling, and a grinding and separating feeling.  (Id.)  Dr. Parlasca acknowledged that

11  plaintiff had an MRI and x-ray of his shoulder.  (Id. at 82-83.)  Dr. Parlasca wrote that plaintiff

12  had possible cervical disc versus impingement right shoulder dislocation.  (Id. at 83.)  "Working

13  diagnosis at the present time is possible radiculopathy as well as possible labral tear or

14  subluxating shoulder."  (Id.)  In the section of his report titled "Plan," Dr. Parlasca wrote,

15            At this point, I am not sure what is going on with his shoulder.  I am going to go
             ahead and get an MRI of his shoulder.  I am going to go ahead and get x-rays of
16            his neck.  He may have a radicular problem here as well.  We are going to work
             up his neck and his shoulder.  His cervical spine is negative.  We are going to go
17            ahead and get his MRI of his cervical spine as well as his shoulder.  I will see him
             back after he gets that.

18

19  (Id.)

20           On November 18, 2008, a doctor at HDSP requested that plaintiff receive the

21  "MR Arthrogram" of his left shoulder ordered by Dr. Parlasca.  (ECF No. 54 at 85.)  An

22  arthrogram is an MRI done with contrast, as opposed to without contrast.[2]

23           A note in plaintiff's medical records dated November 19, 2008, in the same

24  handwriting that previously ordered the MRI without contrast, ordered an arthrogram of

25  _____

26       [2]  See  http://www.cdiradiology.com/tabid/251/Default.aspx.

1    plaintiff's left shoulder and an MRI of plaintiff's spine.  (Id. at 87.)  A note in plaintiff's medical

2    records dated December 4, 2008, states, "Talked to Mandi about order.  It is now a arthrogram.

3    Needs to be scheduled."  (Id. at 90.)

4            The MRI of plaintiff's spine with contrast was performed on December 4, 2008.

5    (Id. at 91.)  The results were normal.  (Id.)

6            On April 30, 2009, defendant Miranda prepared a form titled "Thirty Day

7    Specialty Consult Progress Note," regarding the requested arthrogram of plaintiff's left shoulder.

8    (Id. at 93.)  Defendant Miranda's note states that plaintiff's initial appointment was rescheduled

9    because he declined his last visit.  (Id.)

10           On June 16, 2009, defendant Miranda prepared a form requesting that plaintiff

11   receive steroid injections for chronic left shoulder pain.  (Id. at 97.)  The form also requested that

12   plaintiff receive a consultation with an orthopedist and noted that plaintiff had not received the

13   arthrogram of his left shoulder as recommended by Dr. Parlasca.  (Id.)  Finally, defendant

14   Miranda wrote that plaintiff had no relief from resting his shoulder or NSAIDs.  (Id.)

15           On June 16, 2009, defendant Miranda prepared a form requesting that plaintiff

16   receive physical therapy for his left shoulder pain.  (Id. at 24.)

17           On July 14, 2009, plaintiff had a consultation with orthopedist, Dr. Ford.  (Id. at

18   97.)  Dr. Ford wrote, "needs x-rays and MRI left shoulder.  RTO when done."  (Id.)

19           On August 26, 2009, an MRI of plaintiff's left shoulder was performed at Alliance

20   Imaging.  (ECF No. 51-2 at 98.)  The results indicated no evidence of a rotator cuff tear, mild

21   tendinosis of the distal tendon versus artifact was possible; no other anatomic abnormalities were

22   noted.  (Id.)

23           On September 18, 2009, plaintiff met with defendant Miranda to discuss pain

24   management.  (ECF No. 54 at 101.)  Defendant Miranda wrote,

25           Has been to ortho and they ordered arthrogram to r/o a slap lesion vs. RTC.  Yet
             interqual requires steroid injection and PT-RFS first.  And before the steroid
26           injection, pain management.  Dr. Ford wanted an x-ray and left shoulder MRI

1    before the steroid injection before follow-up, and both studies have now been
2    done.

3    (Id.)

4         In the "assessment/plan" section of his report, defendant Miranda wrote that

5    plaintiff was to follow-up with Dr. Ford regarding his shoulder pain, continue with ibuprofen,

6    and referral for physical therapy pending.  (Id.)

7         Plaintiff had a consultation with Dr. Ford on October 20, 2009.  (Id. at 102-03.)

8    In the section of his report describing plaintiff's "illness," Dr. Ford wrote,

9        This 32-year-old Caucasian male was teaching kite surfing down in Cancun five
    years ago, when the kite was released by his student and he sustained a
10       subluxation of his left shoulder.  At that time the patient was treated with an
    immobilizer for a short period of time, and then he discontinued the
11       immobilization and continued to work. The patient had a fall three years ago at
    which time he sustained a second subluxation of his left shoulder.  Since that time
12       the patient has had continued subluxation problems in his left shoulder with
    chronic pain.

13

14   (Id. at 102.)

15        Regarding his physical examination of plaintiff, Dr. Ford states that plaintiff had

16   full range of motion of his left shoulder with no signs of impingement and no signs of rotator

17   cuff injury.  (Id. at 102.)  He states that the plaintiff has instability with external rotation in

18   abduction with what appears to be anterior subluxation of the head of the humerus.  (Id.)  He

19   states that it is difficult to evaluate plaintiff because he is quite muscular.  (Id.)  Dr. Ford states

20   that after reviewing plaintiff's MRI, it appears that his labrum is intact, but he orders a repeat

21   MRI with contrast to rule out a labral tear.  (Id.)  He states that plaintiff will probably be referred

22   to the Reno Orthopedic Clinic for arthroscopic repairs as indicated.  (Id.)  He states that plaintiff

23   will receive injections for tendinitis, and an EMG is ordered to rule out radiculopathy of the left

24   upper extremity.  (Id.)

25        On October 22, 2009, the HDSP "MAR" Committee denied the request for the

26   EMG and MRI sought by Dr. Ford.  (Id. at 109.)  The note from the MAR Committee stated that

1    it determined that no medical urgency for these tests existed and that observation of steroid

2    injection benefits, physical therapy and conservative measure should be done.  (Id.)

3         On October 22, 2009, defendant Miranda prepared a form notifying plaintiff of the

4    MAR Committee decision.  (Id. at 107.)  In response, plaintiff wrote on the form,

5           Are you kidding?  This is the second arthogram that has been ordered.  The first
       was screwed up and given as a regular MRI and you rescheduled and it never

6           occurred.  What happened.  Now I have serious nerve problems in my left hand.
       The cortisone injection has made the situation worse.  My shoulder is out of place

7           and in pain all the time now.

8    (Id.)

9         On December 9, 2009, the physical therapist responded to defendant Miranda's

10   June 16, 2009, request for plaintiff to receive physical therapy.  (Id. at 112.)  The physical

11   therapist prepared an order for plaintiff to do self-exercises on his left shoulder.  (Id. at 113.)

12        An entry in plaintiff's medical records by the physical therapist on December 17,

13   2009, states that plaintiff reported that he could not lay on his left shoulder and it hurt all the

14   time.  (Id. at 115.)  The physical therapist wrote that plaintiff was unable to complete the exercise

15   program in the gym, so he would bring plaintiff into the physical therapy room.  (Id.)

16        An entry in plaintiff's medical records by the physical therapist on December 23,

17   2009, states that plaintiff reported that his shoulder was the same and that he had not started the

18   exercise program.  (Id. at 116.)  The physical therapist wrote that he would recommend an

19   increase in plaintiff's pain medication in order to increase his tolerance to exercise.  (Id.)  He also

20   said that he would investigate future arthrogram procedure.  (Id.)

21        On January 6, 2010, plaintiff filed a request for health care services form stating,

22   in relevant part, that he did not know if his evening meds were discontinued or needed to be

23   refilled.  (Id. at 117.)  The response, dated January 7, 2010, stated that all meds were current.

24   (Id.)

25        On January 12, 2010, plaintiff saw defendant Miranda.  (Id. at 118.)  Defendant

26   Miranda wrote that plaintiff reported chronic left shoulder pain and radiculopathy to his left hand

1   with slight weakness.  (Id.)  Defendant Miranda wrote,

> Recently, he has been seen to ortho, Dr. Ford, who ordered a repeat shoulder MIR [sic] with contrast to rule out a possible rotator cuff tear, not seen [sic] a non-contrast MRI.  An EMG was also ordered, yet the interqual criteria first requires to evaluate his treatment with a steroid injection that he has received and also PT x 6 weeks.  Physical therapy has requested that the inmate be provided with pain medication, up until his next scheduled PT visit.  Also, he now says he also has right thigh pain x 1 month, after "overstretching during exercise."  He says that pain is located to his right thigh, and his weakness pushing against a fixed object, such as trying to slide off his opposite shoe.  He says his pain is 3/10 on pain scale and does not radiate.  He says it has not affected his gait.

(Id.)

In the section of his report titled "Assessment/Plan," defendant Miranda wrote, "Left shoulder tendonosis – Ortho Dr. Ford suspects inmate may have an underlying RCT not detected on MRI without contrast, and he recommends a repeat MRI with contrast.  Start Tyl. # 3 2 tabs po bid x 30 days maximum only for effective PT.  Continue Ibuprofen as directed. Exercise chrono in the gym granted for 30 days."  (Id.)

On January 14, 2010, defendant Miranda also prescribed Vicodin for plaintiff to help facilitate his range of motion effective for physical therapy.  (Id. at 121.)  Defendant Miranda ordered the Vicodin for up to thirty days until his next physical therapy session, then it would be discontinued.  (Id.)

A handwritten note on defendant Miranda's January 14, 2010 order for Vicodin states, "I/P stated has never received as of 2/18/10, may be already discontinued...."  (Id. at 122.)

On March 1, 2010, plaintiff's physical therapist ordered a discontinuation of the physical therapy and recommended that plaintiff receive a consultation with an orthopedist regarding his left shoulder.  (Id. at 126.)

On March 2, 2010, defendant Miranda submitted a request for an MRI with contrast for plaintiff's left shoulder.  (Id. at 128.)

On May 14, 2010, plaintiff received an MRI of his left shoulder at the Banner Lassen Medical Center in Susanville, California.  (Id. at 130.)  The "impression" of the MRI

were "no rotator cuff tear is seen.  Very prominent sublabral recess.  A slap lesion is less likely in my opinion, but it is difficult to completely rule out." (Id. at 131.)

On May 28, 2010, defendant Miranda referred plaintiff to an orthopedist.  (Id. at 133.)

On August 3, 2010, Dr. Ford examined plaintiff.  (Id. at 134.)  Dr. Ford wrote that plaintiff's MRI with contrast showed his rotator cuff to be totally intact but a very prominent sublabral recess is questionable for a SLAP lesion and tear of the labrum.  (Id.)  Dr. Ford found that plaintiff "has certainly [sic] instability of the left shoulder and probably does represent a labral tear."  (Id.)  Dr. Ford referred plaintiff to Dr. Uppal for arthroscopic evaluation and repair of this lesion.  (Id.)

On October 29, 2010, defendant Miranda examined plaintiff.  (ECF No. 51-2 at 38.)  Plaintiff reported left shoulder pain.  (Id.)  Plaintiff said that his left shoulder pain was 3/10 on a pain scale when taking Ibuprofen.  (Id.)

On October 29, 2010, defendant Miranda submitted a request for plaintiff to receive arthroscopy on his left shoulder.  (ECF 54 at 140.)  In this request, defendant Miranda wrote that plaintiff had chronic left shoulder pain and stiffness and a possible labral tear.  (Id.)  He also wrote that on August 3, 2010, Dr. Ford recommended surgery.  (Id.)

On November 8, 2010, defendant Pomazal denied this request because "the workup appears incomplete – if more information can be provided we will reconsider the request."  (Id. at 141.)

On February 3, 2011, defendant Miranda examined plaintiff.  (Id. at 145.)  Plaintiff told defendant Miranda that he still had pain in his left shoulder.  (Id.)  Plaintiff reported that his left shoulder was unstable and moved around freely when raising his left arm.  (Id.)  Plaintiff stated that his pain was dull and 3/10 on the pain scale.  (Id.)  Defendant Miranda made another referral for plaintiff to see an orthopedist and directed plaintiff to continue taking Ibuprofen as directed.  (Id.)

1    On April 19, 2011, plaintiff saw orthopedist Dr. Cross.  (Id. at 146-47.)  In his

2 report, Dr. Cross wrote that plaintiff had chronic left shoulder pain with episodes of subluxation

3 on a daily basis.  (Id.)  Dr. Cross wrote that the report from plaintiff's last MRI showed an

4 obvious sulcus underneath the labrum anteriorly-inferiorly.  (Id.)  In his section of the report

5 titled "Assessment," Dr. Cross wrote, "The patient has what appears to be clinically significant

6 disability to his shoulder with recurrent subluxation of his shoulder.  The MRA would indicate

7 partial healing of a Bankart deficit."  (Id. at 146.)  In the section of his report titled

8 "Recommendations," Dr. Cross wrote, in relevant part,

9    Based on his current symptoms and persistent symptoms for the past four years, it
     would be reasonable to evaluate this patient under anesthesia.  If disability is
10    appreciated, arthroscopic evaluation of his shoulder would then be the next step to
      be done following the evaluation under anesthesia.  Intraoperative findings would
11    then determine surgical intervention, likely a labral repair would be indicated and
      possible capsulorrhaphy.  This possibly could require conversion to an open
12    capsulorrhaphy depending on intraoperative findings.

13

      ****
14
      The patient is eager to pursue evaluation and surgical intervention of his shoulder.
15    This is an appropriate request and I will place a request for surgery for this patient.

16 (Id.)

17    On September 28, 2011, Dr. Cross performed diagnostic arthroscopic surgery on

18 plaintiff and anthroscopic-assisted labral repairs.  (Id. at 36.)

19 VI.  Defendants' Motion

20    Defendants move for summary judgment on grounds that they did not act with

21 deliberate indifference to plaintiff's serious medical needs.  Defendants rely on the declaration of

22 Dr. B. Barnett.  Dr. Barnett states that he reviewed plaintiff's medical records between May 2010

23 and the present, with particular attention to plaintiff's concern that the timing of the surgery on

24 his left arm caused him to suffer chronic pain and dysfunction that could have been prevented if

25 the surgery had been performed earlier.  (ECF No. 51-2 at 15.)  Dr. Barnett then goes on to

26 discuss plaintiff's medical records, beginning in September 2008.  (Id.)  Although Dr. Barnett

15

1  states he reviewed plaintiff's records beginning with records from May 2010, it is clear that he

2  reviewed some records beginning in September 2008.

3          After summarizing plaintiff's medical records attached to defendants' summary

4  judgment motion, Dr. Barnett concludes:

5      5.  Mr. Lasher's medical records document an unremarkable recovery from
    shoulder surgery will full return to normal function.  On January 26, 2011,
6      physical therapy discharged Lasher in good condition.  On April 30, 2012, Lasher
    reported to his primary care physician that he feels his surgery was successful.  On
7      June 11, 2012, Lasher was able to engage in competitive sports and to the extent
    that he injured his knee while playing baseball in the catcher's position.  There is
8      no medical evidence to support the contention that the repair to Mr. Lasher's
    shoulder was unsuccessful of compromised on account of any delay in performing
9      surgery.

10      6.  The care and treatment provided to Mr. Lasher for his complaints of left
    shoulder pain between 2008 through 2011 was medically appropriate.  Far from
11      indicating deliberate indifference to Mr. Lasher's medical need, the primary care
    providers and medical leadership responsible for overseeing medical care to
12      Lasher applied reasonable cautions in favoring conservative, non-surgical
    therapies before implementing treatments with a higher risk of complication.
13

14      7.  In 2008, Mr. Lasher's medical record documents evaluations, including an
    MRI, that do not reveal any condition urgently requiring surgical intervention.  In
15      2009, a repeated MRI was unchanged from 2008.  Physical therapy was ordered,
    consistent with community standards that favor conservative treatments of chronic
16      shoulder pain and dysfunction such as described by Lasher.  In 2010, a request for
    surgical treatment was denied insofar as Lasher appeared to be doing relatively
17      well with conservative therapy; there was no evidence that Lasher suffered any
    compromise in his daily activities; and he reported pain reduced to 3/10 with the
18      use of ibuprofen.  In 2011, Lasher reported instability in his shoulder and surgery
    was scheduled.

19      8.  The results of surgical intervention for chronic shoulder discomfort or
    instability is poor in the prison environment where many inmates are
20      not able to or willing to comply with post operative rehabilitation.  In the free
    world, too, surgery is not recommended as initial therapy.  See, e.g., American
21      Academy of Orthopedic Surgeons, Essentials of Musculoskeletal Care 3rd edition
    (2005), pages 222-226 (describes difficulty in making accurate diagnoses and
22      recommends non surgical care, including NSAIDS and physical therapy prior to
    arthroscopy).  Moreover, there appeared to be no urgency to do surgery based
23      upon Lasher's functional status.  Just weeks before his arthroscopy, Lasher was
    active enough to cut his eyebrow while playing in a game of football.  Thus the
24      delay from efforts over a significant time to treat Lasher without surgery was
    reasonable.  The care provided was careful, considerate, exhibited careful thought
25      and judgment by his treating physicians, and was not deliberately indifferent.  It is
    also my opinion that the medical care provided did not cause Lasher to suffer any
26      harm and did not expose Lasher to any risk of harm.

9.  Based upon my review of the medical records, my training and experience, and pertinent authoritative medical literature, it is my professional opinion that the medical care provided to Lasher from 2008 through 2011 in regards to his shoulder was appropriate and proper, meeting or exceeding applicable community standards of care for best medical practice.

(Id. at 18-19.)

V.  Discussion

A.  Did Defendants Violate Plaintiff's Eighth Amendment Rights?

The undersigned herein considers the first prong of the qualified immunity analysis: taken in the light most favorable to plaintiff, do the facts show that defendants' conduct violated plaintiff's Eighth Amendment rights?

Plaintiff is raising three claims.  First, he alleges that as a result of the delay in his receipt of shoulder surgery, he suffered unnecessary pain and discomfort.  Second, plaintiff alleges that the delay in surgery caused additional damage to his shoulder.  Third, plaintiff alleges that he did not receive adequate treatment for pain while awaiting surgery.

*Did Alleged Delay in Surgery Cause Further Shoulder Damage?*

Defendants argue that the alleged delay in surgery did not cause further damage to plaintiff's shoulder.

Although they are not summarized above, both parties have submitted plaintiff's relevant post-surgery medical records.  After reviewing these records, as well as the records regarding plaintiff's pre-surgery care, the undersigned finds no evidence that any delay in plaintiff's surgery caused further damage to plaintiff's shoulder.  (See post surgery records:  ECF No. 51-2 at 45-63, ECF No. 54 at 34-49.)  Defendants have also presented expert evidence, i.e. Dr. Barnett's declaration, that the alleged delay in shoulder surgery did not cause further damage to plaintiff's shoulder.  Plaintiff has presented no expert evidence in support of this claim.  For these reasons, the undersigned finds that defendants are entitled to summary judgment as to this claim.

////

1          *Did Alleged Delay Cause Pain and Suffering?*

2          According to <u>McGuckin</u>, the unnecessary continuation of pain may constitute the

3   harm necessary to establish that an Eighth Amendment violation resulted from a delay in

4   providing medical care.  974 F.2d at 1062.  But continuous pain alone does not satisfy all the

5   elements of deliberate indifference.  <u>See</u> <u>Jett</u>, 439 F.3d at 1096 (harm caused by indifference is

6   only one of two elements under the second prong of the Ninth Circuit's deliberate indifference

7   test).  In order to satisfy the second prong, plaintiff must still show "a purposeful act or failure to

8   respond to a prisoner's pain or possible medical need."  <u>Id.</u>

9          The undersigned first finds that, taking the facts in the light most favorable to

10  plaintiff, he suffered continuous pain and suffering in his left shoulder from May 2008 until

11  September 2011, when he received shoulder surgery.  According to the medical records

12  summarized above, plaintiff consistently reported pain in his left shoulder.

13         The amount of pain plaintiff suffered is somewhat disputed.  Plaintiff's medical

14  records indicate that plaintiff generally reported pain at 3/10.  In contrast, in his verified amended

15  complaint, plaintiff alleges that the pain was "virtually unbearable."  (ECF No. 12 at 3: 22.)  A

16  pain level of 3/10 is more than de minimis and the decision to authorize the surgery was based on

17  four years of pain at this level.

18         In addition to shoulder pain, plaintiff consistently reported shoulder instability.  In

19  response to the October 22, 2009 MAR decision denying Dr. Ford's request for an MRI, plaintiff

20  wrote that his shoulder was out of place and he was in pain all the time.  The medical records

21  also indicate that plaintiff repeatedly reported shoulder instability, which was confirmed by the

22  examining physicians.  In September 2008, Dr. Paralsca found that plaintiff might have

23  subluxating shoulder.[3]  In reports dated October 2009 and August 2010, Dr. Ford wrote that

24  plaintiff had shoulder instability or subluxation.  In his April 11, 2011 report, Dr. Cross

25  _____

26         [3]  The undersigned understands "shoulder subluxation" to generally refer to shoulder
    instability.

1  recommended that plaintiff receive surgery based on his "current symptoms and persistent

2  symptoms for the past four years."

3          Accordingly, viewing the record in the light most favorable to plaintiff, there is

4  sufficient evidence that plaintiff suffered harm, i.e., ongoing pain as well as shoulder instability,

5  as a result of the alleged delay in his receipt of surgery.

6          Next, for the following reasons, the undersigned finds that defendants have not

7  met their burden of demonstrating the absence of genuine issues of material fact regarding

8  whether they failed to respond to plaintiff's pain and need for surgery.

9          Defendants have  presented unopposed expert evidence that conservative

10 treatment before shoulder surgery is within the standard of care.  However, the undersigned can

11 find no record supporting Dr. Barnett's statement that the November 2010 request for surgery

12 was denied because plaintiff was doing well with conservative treatment.  In fact, the records

13 demonstrate that when the request for surgery was denied in November 2010, plaintiff had

14 completed the course of conservative treatment previously ordered and his condition had not

15 improved.  In March 2010, the physical therapist discontinued physical therapy and referred

16 plaintiff to an orthopedist.  At that time, plaintiff had also been receiving steroid injections and

17 pain medication, which had not improved his condition.  It appears that Dr. Ford's August 2010

18 recommendation that plaintiff receive surgery was based on the ineffectiveness of conservative

19 treatment.  For these reasons, the undersigned finds that defendants' claim regarding why the

20 November 2010 request for surgery was denied is not supported by the record.

21          Moreover, plaintiff has submitted a medical record stating that defendant Pomazal

22 denied the November 2010 request for surgery because the request was incomplete.  Defendants

23 do not address this record, as well as defendant Pomazal's statement that he would reconsider the

24 request if more information could be provided.  Defendants do not address why defendant

25 Miranda, who submitted the surgery request based on Dr. Ford's recommendation, did not

26 submit a more complete request for surgery.

1       In his declaration, Dr. Barnett states that plaintiff's request or surgery was granted

2   once he reported shoulder instability.  However, as discussed above, plaintiff's medical records

3   indicate that he consistently reported shoulder instability well before the request for surgery was

4   granted.  Based on this record, the undersigned finds that Dr. Barnett's statement that plaintiff's

5   surgery was granted only once he reported shoulder instability is not supported by the record.

6       Defendants also do not address the delay in plaintiff's receipt of the MRI ordered

7   by Dr. Parlasca in September 10, 2008.  Plaintiff finally received this MRI almost one year later,

8   in August 2009.  While defendant Miranda's April 30, 2009 note states that the MRI had to be

9   rescheduled because plaintiff "declined" his last visit, this entry does not fully explain the year

10  long delay.[4]  In October 2009, the MAR Committee denied Dr. Ford's request for a third MRI,

11  this one without contrast, finding that plaintiff should receive conservative treatment instead.

12  Had plaintiff received a timely second MRI, then he may have received conservative treatment

13  and surgery sooner.

14      In his unverified opposition, plaintiff argues that part of the delays were caused

15  because he did not receive the correct MRIs.  For example, plaintiff argues that he did not receive

16  an MRI of his left shoulder with contrast on December 4, 2008, as ordered by Dr. Parlasca,

17  because an MRI without contrast was improperly ordered.  The undersigned cannot determine

18  from the present record whether plaintiff received incorrect MRIs.

19      For the reasons discussed above, the undersigned recommends that defendants'

20  summary judgment motion as to plaintiff's claim that the alleged delay in his receipt of shoulder

21  surgery caused him unnecessary pain and suffering be denied.

22  ////

23  ////

24

25      [4]  In his unverified opposition, plaintiff disputes the veracity of this entry in his records by
    defendant Miranda, and claims that it was an attempt to cover-up his failure to order the correct
26  test.

20

1        *Alleged Denial of Pain Medication*

2                Regarding plaintiff's receipt of pain medication, defendants argue that plaintiff

3    received adequate pain mediation, citing their undisputed fact no. 14.  (ECF No. 51 at 6.)

4    Defendants' undisputed fact no. 14 references paragraph 7 of Dr. Barnett's declaration.  (ECF

5    No. 51-1 at 6.)  Paragraph 7 of Dr. Barnett's declaration is quoted above.  The only reference to

6    pain medication contained in this paragraph is his statement that in 2010, the request for surgery

7    was denied because he reported his pain reduced to 3/10.  (ECF 51-2 at 18.)  The undersigned

8    cannot locate any exhibit stating that the 2010 request for surgery was denied because plaintiff's

9    pain was 3/10.  In any event, paragraph 7 of Dr. Barnett's declaration does not address plaintiff's

10   claim that he was denied adequate pain medication during the time he was awaiting surgery.

11   Accordingly, defendants have not met their burden as to this claim.  For this reason, defendants'

12   motion for summary judgment as to this claim should be denied.[3]

13              B.  Were Plaintiff's Eighth Amendment Rights Clearly Established?

14              Regarding plaintiff's claim that the delay in his receipt of surgery caused him to

15   suffer unnecessary pain, the undersigned next considers the second prong of the qualified

16   immunity analysis: were plaintiff's rights clearly established so that a reasonable official would

17   know that delaying plaintiff's surgery violated his Eighth Amendment rights?

18              Because of the inadequate record regarding the following issues, the undersigned

19   cannot analyze the second prong of the qualified immunity analysis as to this claim:  1) the

20   reasons for the delay in plaintiff's receipt of the MRI ordered by Dr. Parlasca in September 2008;

21   2)  the reasons defendant Pomazal found the work-up for plaintiff's surgery request incomplete;

22   3) the reasons why defendant Miranda did not submit a second request for surgery; 3)  Dr.

23

24          [3]  Plaintiff's opposition focuses his argument regarding inadequate pain medication on his
     alleged failure to receive the Vicodin prescribed by defendant Miranda on January 14, 2010.
25   (ECF No. 54 at 121.)  The purpose of the Vicodin was to help facilitate plaintiff's range of
     motion effective for physical therapy.  (Id.)  Plaintiff complained that he did not receive the
26   Vicodin.  (Id. at 122.)

1   Barnett's unsupported statement that the 2010 request for surgery was denied because plaintiff

2   was doing well with conservative treatment; and 4) Dr. Barnett's unsupported statement that the

3   request for surgery was granted once plaintiff reported shoulder instability.

4          Because defendants did not meet their burden in addressing plaintiff's claim

5   regarding inadequate pain medication, the undersigned need not consider the second prong of the

6   qualified immunity analysis with respect to this issue.

7          In the section of their summary judgment motion addressing this second prong of

8   the qualified immunity analysis, defendants state, "Plaintiff cannot link any of the four

9   Defendants to any wrongdoing establishing a constitutional violation." (ECF No. 51 at 8: 4-5.)

10  Defendants then go on to argue, "But even assuming he could, the Defendants in this case would

11  nonetheless be entitled to qualified immunity because each defendant acted reasonably and

12  appropriately in accordance with established law." (Id. at 8: 5-7.)  An argument that plaintiff did

13  not adequately link defendants to the alleged deprivations should not be raised in a discussion of

14  the second prong of the qualified immunity analysis.  Moreover, defendants' one sentence

15  "failure to link" argument does not adequately address this issue.  The undersigned will not comb

16  through the records on defendants' behalf in order to determine whether all defendants are

17  linked.

18  VI.  State Law Claims

19         Defendants also move for summary judgment as to any state law claims plaintiff

20  is raising.  Defendants state that although plaintiff does not specifically raise a medical

21  malpractice claim, he references the "laws of the State of California."  In his opposition to

22  defendants' motion, plaintiff clarifies that he is not raising any state law claims.

23         Accordingly, IT IS HEREBY RECOMMENDED that defendants' summary

24  judgment motion (ECF No. 51) be granted as to plaintiff's claim that his delay in receipt of

25  shoulder surgery caused additional shoulder damage; defendants' motion should be denied in all

26  other respects.

1          These findings and recommendations are submitted to the United States District

2   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

3   one days after being served with these findings and recommendations, any party may file written

4   objections with the court and serve a copy on all parties.  Such a document should be captioned

5   "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

6   objections shall be filed and served within fourteen days after service of the objections.  The

7   parties are advised that failure to file objections within the specified time may waive the right to

8   appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

9   DATED:  June 12, 2013

10

11

12                       KENDALL J. NEWMAN
                    UNITED STATES MAGISTRATE JUDGE

13   lash2564.sj

14

15

16

17

18

19

20

21

22

23

24

25

26